Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Block]

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JIANPING MA, derivatively on behalf of SUNPOWER CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>PETER FARICY, GUTHRIE DUNDAS, ELIZABETH EBY, NATHANIEL ANSCHUETZ, JONATHAN BRAM, JONATHAN FIELDSEND, VINAYAK HEGDE, STEVEN LOUDEN, THOMAS MCDANIEL, NATHALIE PORTES-LAVILLE, VINCENT STOQUART, and AUDREY ZIBELMAN,<br><br>Defendants,<br><br>and<br><br>SUNPOWER CORPORATION,<br><br>Nominal Defendant. | Case No.:<br><br>**DEMAND FOR JURY TRIAL** |

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

## INTRODUCTION

Plaintiff Jianping Ma ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant SunPower Corporation ("SunPower" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Peter Faricy ("Faricy"), Guthrie Dundas ("Dundas"), Elizabeth Eby ("Eby"), Nathaniel Anschuetz ("Anschuetz"), Jonathan Bram ("Bram"), Jonathan Fieldsend ("Fieldsend"), Vinayak Hegde ("Hegde"), Steven Louden ("Louden"), Thomas McDaniel ("McDaniel"), Nathalie Portes-Laville ("Portes-Laville"), Vincent Stoquart ("Stoquart"), and Audrey Zibelman ("Zibelman") (collectively, the "Individual Defendants," and together with SunPower, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of SunPower, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Faricy, Dundas, and Eby for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon Plaintiff's own knowledge and own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SunPower, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by SunPower's directors and officers from March 9, 2023 to October 24, 2023, both dates inclusive (the "Relevant Period").

2. SunPower is an American provider of photovoltaic ("PV") solar energy generation systems and battery energy storage products with a particular focus on residential generation. PV solar energy systems convert light into electricity through the use of semiconducting materials, most typically solar panels. Accordingly, SunPower's primary focus is developing solar panel technology for residential customers. In addition, SunPower produces batteries to store excess solar energy produced by solar panels.

3. On March 9, 2023, the Company filed a Form 10-K with the SEC for the period and full-year ended January 1, 2023 (the "2022 10-K"). Therein, the Company reported that its revenue had increased by 53% during the fiscal year 2022 due to organic growth from residential businesses. Additionally, the Company stated that its Audit Committee and management had evaluated the Company's internal controls over financial reporting and deemed it effective.

4. On May 3, 2023, the Company filed its Form 10-Q for the period ended April 2, 2023 (the "1Q 2023 10-Q") with the SEC. In it, the Company reported a 25% change in its cost of revenues and reaffirmed its financial projections for the year.

5. The truth began to emerge on July 26, 2023, when SunPower issued a press release announcing the Company's preliminary second quarter 2023 results and adjusting earnings guidance for the year. The press release revealed that the Company had reduced: 2023 guidance for GAAP net loss to ($90) million-($70) million, customer demand to 70,000 – 90,000, residential Adjusted EBITDA per customer to $1,450 - $1,650, and Adjusted EBITDA to $55 million-$75 million.

6. On this news, the Company's share price fell from a closing price of $11.22 per share on July 25, 2023 to a closing price of $9.45 per share on July 26, 2023, representing a decrease of $1.77 per share, or 18.5%.

7. On August 2, 2023, the Company filed a Form 10-Q with the SEC for the quarter ended July 2, 2023 (the "2Q 2023 10-Q"). The Company again reported a 25% change in total costs of revenue and reported its total inventory of microinverters.

8. The truth fully emerged on October 24, 2023 when, after the market closed, the Company filed a Form 8-K with the SEC (the "October 24 Form 8-K"), revealing a material weakness in its internal controls and the impending restatement of certain of the Company's previously-issued financial statements. The October 24 Form 8-K stated that the Company's Annual Report for the period ended January 1, 2023, the Forms 10-Q for the quarterly periods ended April 2, 2023 and July 2, 2023, and any statements made based on those reports should no longer be relied upon. In addition, the Company announced plans to restate these improper financial statements and announced that more information would be provided in the soon-to-be restated Form 10-K. The Form 10-K revealed that "a material weakness exists in the Company's internal control over financial reporting." In particular, the Company had incorrectly determined the value of its consignment inventory of "microinverter components," thereby resulting in the associated cost of revenue being understated.

9. On this news, the Company's stock price declined from a closing price of $4.96 on October 24, 2023 to a closing price of $4.06 on October 25, 2023, representing a decline of $0.90 per share, or 18.1%.

10. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) material weaknesses in internal controls resulted in the Company inaccurately reporting revenue and inventory; (2) because of the foregoing, SunPower was reasonably likely to incur significant charges to

restate its previously-reported financial statements; and (3) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

11. The Individual Defendants further breached their fiduciary duties by causing SunPower to repurchase its own stock at artificially-inflated rates. Indeed, between March 2023 and October 2023, the Individual Defendants caused the Company to repurchase approximately 478,345 shares of SunPower common stock at artificially-inflated prices, costing the Company approximately $6.36 million. Since the repurchased stock was only worth $4.06 per share, which was the price at the close of trading on October 25, 2023, SunPower overpaid by over $4.41 million.

12. Thus, in total, during the Relevant Period, the Individual Defendants caused the Company to repurchase 478,345 shares of Company common stock at an aggregate total price of over $6.31 million thereby causing the Company to overpay by $4.41 million for repurchases of its common stock during the Relevant Period.

13. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14. In light of the Individual Defendants' misconduct—which has subjected SunPower, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its former CFO to two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's, CFO's, and former CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of SunPower's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

18. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

19. Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

23. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and SunPower is headquartered in this District.

## PARTIES

**Plaintiff**

24. Plaintiff is a current shareholder of SunPower common stock. Plaintiff has continuously held SunPower common stock since first purchasing the stock on January 28, 2021.

25. Plaintiff is a citizen of Oklahoma.

**Nominal Defendant SunPower**

26. SunPower is a Delaware corporation with principal executive offices at 880 Harbour Way South, Suite 600, Richmond, California 94804. SunPower's shares trade on NASDAQ under the ticker symbol "SPWR." SunPower is a citizen of Delaware.

**Defendant Faricy**

27. Defendant Faricy has served as the Company's CEO, President, and as a Company director since April 19, 2021, and as chair of the Board since November 2021. According to the Schedule 14A the Company filed with the SEC on March 31, 2023 (the "2023 Proxy Statement"), as of

March 15, 2023, Defendant Faricy beneficially owned 190,093 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2023 was $13.69, Defendant Faricy owned approximately $2.6 million worth of SunPower common stock.

28. For the fiscal year ended January 1, 2023 ("Fiscal Year 2022"), Defendant Faricy received $5,512,596 in total compensation from the Company. This included $660,000 in base salary, $4,288,056 in stock awards, $55,390 in non-equity incentive plan compensation, and $9,150 in all other compensation.

29. Upon information and belief, Defendant Faricy is a citizen of Washington.

30. The 2023 Proxy Statement stated the following about Defendant Faricy:

> Peter Faricy has served as our president and chief executive officer and as a member of the Board since April 2021, and chair of the Board since November 2021. Peter Faricy joined our company as president and chief executive officer on April 19, 2021. Mr. Faricy previously served as chief executive officer, Global Direct-to-Consumer, of Discovery Inc. from September 2018 to August 2020, overseeing businesses including Discovery+, Food Network Kitchen, Magnolia, Eurosport Player, and GOLFTV. Prior to Discovery, Mr. Faricy spent 13 years with Amazon.com, Inc., most recently as vice president leading the Amazon Marketplace from January 2009 to September 2018. From July 2006 to January 2009, he served as Amazon's vice president, music and movies. Prior to Amazon, Faricy held management roles at Borders Group, Ford Motor Company, and McKinsey & Co. He received his MBA with distinction from the University of Michigan and his B.A. in business administration from Michigan State University. Mr. Faricy has served on the University of Michigan Ross School of Business Advisory Board since 2013 and served on the board of directors of Blue Apron Holdings, Inc. from 2020 to 2022.
>
> Mr. Faricy brings significant leadership and management experience to the Board. As our president and chief executive officer, Mr. Faricy provides the Board with insight into our operations and his perspective as the Company's chief executive. Mr. Faricy also brings to the Board the benefit of his management experience at other large companies and leadership experience through his service on the board of other companies. It is based on the Board's identification of these qualifications, skills, and experience that the Board has concluded that Mr. Faricy should serve as a director on the Board.

**<u>Defendant Dundas</u>**

31. Defendant Dundas was the Company's Interim CFO from August 29, 2022 to May 29, 2023. According to the 2023 Proxy Statement, as of March 15, 2023, Defendant Dundas beneficially owned 18,792 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2023 was $13.69, Defendant Dundas owned approximately $257,262 worth of SunPower common stock.

32. For the Fiscal Year 2022, Defendant Dundas received $751,107 in total compensation from the Company. This included $349,004 in salary, $315,179 in stock awards, $78,316 in non-equity incentive plan compensation, and $8,606 in all other compensation.

33. Upon information and belief, Defendant Dundas is a citizen of California.

34. The 2023 Proxy Statement stated the following about Defendant Dundas:

> Guthrie Dundas has been serving as interim Chief Financial Officer since August 2022. Mr. Dundas has served as our Vice President, Project Finance, since March 2020 and also as Treasurer since July 2020. Prior to March 2020, Mr. Dundas was the owner of Ponderosa Capital Solutions, LLC, which provided advisory services on corporate and project capital formation starting in April 2019. Prior to that, Mr. Dundas spent nearly a decade at SunPower where he held a variety of roles in financing until February 2019, including leading the residential project finance and financial products teams. Mr. Dundas received his bachelor's degree in economics and mathematics from Pomona College and an MBA from the University of California, Berkeley.

**<u>Defendant Eby</u>**

35. Defendant Eby has served as the CFO of the Company since May 15, 2023. According to the 2022 Proxy Statement, Defendant Byelick receives an annual base salary of $275,000 from the Company.

36. Upon information and belief, Defendant Eby is a citizen of California.

37. The Company's website[1] states the following about Defendant Eby:

> Elizabeth Eby

---

[1] *Officers*, SUNPOWER, https://investors.sunpower.com/corporate-governance/management (last visited Dec. 28, 2023).

> Executive Vice President, Chief Financial Officer, and Principal Accounting Officer
> Elizabeth Eby serves as SunPower's executive vice president and chief financial officer. Ms. Eby served most recently as the chief financial officer of NeoPhotonics Corporation from August 2017 to August 2022. Prior to that, she grew her career at Intel Corporation, where she held several senior roles during her more than 25-year tenure, including vice president of finance and group chief financial officer for the Internet of Things business. Ms. Eby has a Bachelor of Science degree in Mathematics from University of Michigan and a Master of Science in Industrial Administration (MBA) from Carnegie Mellon University.

**<u>Defendant Anschuetz</u>**

38. Defendant Anschuetz has served as a SunPower director since September 23, 2022. As a member of the Board, Defendant Anschuetz serves as a member of the Nominating and Corporate Governance Committee ("Nominating Committee").

39. Upon information and belief, Defendant Anschuetz is a citizen of New York.

40. The 2023 Proxy Statement states the following about Defendant Anschuetz:

> Nathaniel Anschuetz is a principal at Global Infrastructure Partners ("GIP"). Prior to joining GIP in 2012, Mr. Anschuetz was an analyst in the Power & Utilities Coverage Group at Citigroup from June 2010 through June 2012. Mr. Anschuetz holds a B.A. in economics and operations research and a concentration in sustainable development from Columbia College. He is a member of the board of directors of Clearway Energy, Inc., Clearway Energy Group, LLC, and Eolian, L.P.
>
> Mr. Anschuetz brings significant operational and business development experience to the Board. His extensive experience in the energy industry gives him a valuable perspective on our strategy going forward. It is based on the Board's identification of these qualifications, skills, and experience that the Board has concluded that Mr. Anschuetz should serve as a director on the Board.

**<u>Defendant Bram</u>**

41. Defendant Bram has served as a Company director since September 23, 2022. As a member of the Board, Defendant Bram serves on the Compensation Committee.

42. Upon information and belief, Defendant Bram is a citizen of New York.

43. The Company's 2023 Proxy Statement stated the following about Defendant Bram:

> Jonathan Bram is a founding partner of GIP, a leading independent infrastructure fund manager which manages $87 billion for its investors. GIP is a leading investor in renewables globally and has a current portfolio of 18 gigawatts in operation and 175

gigawatts in development. Mr. Bram serves on GIP's Investment and Operating Committees and chairs the Investment Committee of its credit funds. Prior to the formation of GIP in 2006, Mr. Bram spent 15 years at Credit Suisse as a managing director in the Investment Banking Division, where he served in a variety of positions including co-head of the Global Industrial and Services Group, chief operating officer of the Investment Banking Division, and co-head of corporate finance for the 150-person U.S. Energy Group. He has experience financing and investing in renewables companies and projects that utilize wind, solar, geothermal, and hydroelectric technologies. Mr. Bram holds a B.A. in economics from Columbia College. He is the chair of the board of directors of Clearway Energy, Inc. and a board member of Chilean Renovables, and he previously served on the boards of Terra-Gen Power, Guacolda Energy, and Channelview Cogeneration.

Mr. Bram brings significant international managerial and business development experience to the Board, including extensive experience growing and managing global electric power businesses, which gives him a valuable perspective on our efforts to manage our business activities. It is based on the Board's identification of these qualifications, skills, and experience that the Board has concluded that Mr. Bram should serve as a director on the Board.

**Defendant Fieldsend**

44. Defendant Fieldsend has served as a Company director since July 24, 2022. As a member of the Board, Defendant Fieldsend serves on the Nominating Committee.

45. Upon information and belief, Defendant Fieldsend is a citizen of France.

46. The Company's 2023 Proxy Statement stated the following about Defendant Fieldsend:

Jonathan Fieldsend has served as vice president of corporate PPAs and renewables marketing at TotalEnergies since 2021. He has over 25 years of experience in energy marketing to both residential and business customers at TotalEnergies, during which time he helped develop TotalEnergies' UK gas and power marketing business, drove the transformation of TotalEnergies' French commercial gas and power marketing business, and launched TotalEnergies' commercial power marketing business in Spain. Mr. Fieldsend also set up TotalEnergies' distributed generation business outside the United States, launching "at scale" operations in Europe, Middle East, Southeast Asia, and China. Prior to TotalEnergies, Mr. Fieldsend worked in European retail and business operations for American Express from 1987 to 1997. Mr. Fieldsend earned a Bachelor of Arts from University of Hertfordshire, a Master of Science in Information Technology from University of Brighton, and an MBA.

Mr. Fieldsend brings significant international managerial and business development experience to the Board, including extensive experience in energy marketing, which gives him a valuable perspective on our efforts to manage our business activities. It is based on the Board's identification of these qualifications, skills, and experience that the Board has concluded that Mr. Fieldsend should serve as a director on the Board.

**Defendant Hegde**

47. Defendant Hegde has served as a Company director since January 25, 2022. As a member of the Board, he serves on the Audit Committee and as Chairperson of the Compensation Committee. According to the 2023 Proxy Statement, as of March 15, 2023, Defendant Hegde beneficially owned 14,104 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2023 was $13.69, Defendant Hegde owned approximately $193,083.76 worth of SunPower common stock.

48. For Fiscal Year 2022, Defendant Hegde received $300,038 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $200,038 in stock awards.

49. Upon information and belief, Defendant Hegde is a citizen of Washington.

50. The Company's 2023 Proxy Statement stated the following about Defendant Hegde:

> Vinayak Hegde has served as the CMO Consumer for T Mobile since February 2022. He served as president of Wheels Up from October 2021 until November 2022, after joining the company in May 2021 as its chief marketplace officer. He oversaw strategy and execution of initiatives across all aspects of Wheels Up, including revenue accountability, product strategy, technology development, business strategy, sales and member experience, and operations. From July 2020 through March 2021, Mr. Hegde served as president and chief operating officer of Blink Health. From September 2018 to July 2020, he served as chief marketing officer of Airbnb Homes, where he was responsible for the growth and marketing of its global business. Mr. Hegde served as global chief marketing officer of Groupon from October 2014 to September 2018, managing marketing, national sales, and revenue management, and as vice president of computational and growth marketing from February 2012 to October 2014. Prior to Groupon, Mr. Hegde spent twelve years with Amazon in a variety of management roles. Mr. Hegde serves as a member of the board of directors of Gannett Co., Inc. He holds a Bachelor of Engineering from National Institute of Technology in Karnataka, India.
>
> Mr. Hegde brings extensive experience in marketing and operations to the Board, as well as significant experience as a public company executive, allowing him to make significant contributions to our strategic business planning. It is based on the Board's identification of these qualifications, skills, and experience that the Board has concluded that Mr. Hegde should serve as a director on the Board.

**Defendant Zibelman**

51. Defendant Zibelman has served as a Company director since May 18, 2023. As a member of the Board, Defendant Zibelman serves as the Chairperson of the Nominating Committee and as a member of the Audit Committee.

52. Upon information and belief, Defendant Zibelman is a citizen of California.

53. The Company's website states the following about Defendant Zibelman:

> Audrey Zibelman currently serves as an advisor and non-executive director to multiple companies and organizations leading on climate change, including RMI, Span IO, and Squadron Energy, and is also a member of President Biden's National Infrastructure Advisory Council. Ms. Zibelman served as Vice President of X, Alphabet's moonshot factory, from 2021 to 2022, where she led a team focused on building accurate digital tools necessary for a decarbonized power system, and continues to serve as an advisor to X on climate technology. From 2017 to 2021, Ms. Zibelman served as Managing Director and CEO of the Australian Energy Market Operator, Australia's national electricity and gas system planner and operator. From 2013 to 2017, Ms. Zibelman chaired the New York Public Service Commission, where she was a member of the Governor's cabinet. She has also previously served as Chief Operating Officer of PJM, the world's largest wholesale energy market, and Xcel Energy, a multi-state integrated gas and electric utility. Ms. Zibelman has a Bachelor of Arts from Penn State University and a Juris Doctor from Mitchell Hamline School of Law.

**Defendant Louden**

54. Defendant Louden has served as a Company director since March 14, 2023. As a member of the Board, he serves as the Lead Independent Director, the Chair of the Audit Committee, and as a member of the Compensation Committee and Nominating Committee.

55. Upon information and belief, Defendant Louden is a citizen of Washington.

56. The 2023 Proxy Statement stated the following about Defendant Louden:

> Steven Louden is a seasoned finance and strategy executive with extensive experience across consumer-oriented industries, including technology, media and entertainment, internet, retail, and financial services. Mr. Louden currently serves as the chief financial officer of Roku, Inc. He led Roku's successful IPO and has played a pivotal role in the company's growth trajectory since he joined in 2015. Prior to Roku, Mr. Louden served in various finance capacities at Expedia, Inc., including most recently as its treasurer. Prior to Expedia, Mr. Louden held finance, strategy, and planning roles at Washington Mutual, Inc., McKinsey & Company, and the Walt Disney Company. Mr. Louden holds a B.A. in economics and mathematics from Claremont McKenna College and a M.B.A. from Harvard Business School. He currently serves on the board of directors of Zumiez Inc.

> Mr. Louden brings significant operational experience, including extensive experience in finance and strategic roles across multiple industries, to the Board. In addition, Mr. Louden's experience as a chief financial officer qualifies him as a financial expert, which is relevant to his duties as an Audit Committee member. It is based on the Board's identification of these qualifications, skills, and experience that the Board has concluded that Mr. Louden should serve as a director on the Board.

**Defendant Portes-Laville**

57. Defendant Portes-Laville has served as a Company director since 2021.

58. Upon information and belief, Defendant Portes-Laville is a citizen of France.

59. The 2023 Proxy Statement stated the following about Defendant Portes-Laville:

> Nathalie Portes-Laville serves as a vice president in corporate and project finance for TotalEnergies, based in Paris, France. She has held various positions in finance within TotalEnergies for the past 15 years, first in mergers and acquisitions, then in strategy for the Marketing and Services division of TotalEnergies. She has also served as chief financial officer of TotalEnergies Marketing Puerto Rico, as head of individual shareholders' relations and as head of pension and employee benefits. During her assignment as head of pension and employee benefits, she was also a director of a French health insurance company. Prior to joining TotalEnergies, Ms. Portes-Laville worked in mergers and acquisitions at UBS Investment Bank in London. Ms. Portes-Laville is a graduate of Hautes Etudes Commerciales (HEC) business school in France.
>
> Ms. Portes-Laville brings significant international business and strategy experience to the Board. Her extensive experience in the energy industry, and particularly in mergers and acquisitions, gives her a valuable perspective on our growth and business development activities. It is based on the Board's identification of these qualifications, skills, and experience that the Board has concluded that Ms. Portes-Laville should serve as a director on the Board.

**Defendant Stoquart**

60. Defendant Stoquart has served as a Company director since 2022. He also serves as a member of the Compensation Committee.

61. Upon information and belief, Defendant Stoquart is a citizen of France.

62. The 2023 Proxy Statement stated the following about Defendant Stoquart:

> Vincent Stoquart has served as senior vice president of the Renewables division of TotalEnergies S.E. since December 6, 2021. From October 2019 to December 2021, he served as senior vice president, Refining and Petrochemicals Americas, and president and chief executive officer of Total Petrochemicals & Refining USA, Inc. He was, during this

> period, also the country chair for TotalEnergies in the United States, based in Houston, Texas. Prior to that, Mr. Stoquart served as senior vice president, Polymers, of Total Refining & Petrochemicals in Brussels, Belgium. From 2012 to 2017, Mr. Stoquart managed TotalEnergies's Flanders Refinery in Dunkirk, France, before joining Total Global Services where he became president, Total Learning Solutions. Mr. Stoquart began his career with TotalEnergies in 1998 as an engineering project manager at the Feluy Polymers Plant in Belgium, working as a production manager in various positions from 2002 to 2009 before being appointed as human resources and communications manager of the Feluy Plant in 2010. Mr. Stoquart graduated as a mechanical engineer from the Catholic University of Louvain, Belgium. He also has a diploma in aeronautics and aerospace from the von Karman Institute for Fluid Dynamics.
>
> Mr. Stoquart brings significant international managerial and operational experience to the Board. His extensive experience in the energy industry gives him a valuable perspective on the global energy marketplace. It is based on the Board's identification of these qualifications, skills, and experience that the Board has concluded that Mr. Stoquart should serve as a director on the Board.

**Defendant McDaniel**

63. Defendant McDaniel served as a Company director from 2009 until his retirement in July 2023. As a member of the Board, Defendant McDaniel served as the Chairperson of the Audit Committee and as a member of the Compensation Committee and Nominating Committee. According to the 2023 Proxy Statement, as of March 15, 2023, Defendant McDaniel beneficially owned 292,402 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2023 was $13.69, Defendant McDaniel owned approximately $4 million worth of SunPower common stock.

64. For Fiscal Year 2022, Defendant McDaniel received $325,038 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $200,038 in stock awards.

65. Upon information and belief, Defendant McDaniel is a citizen of California.

66. The 2023 Proxy Statement stated the following about Defendant McDaniel:

> Thomas McDaniel was executive vice president, chief financial officer, and treasurer of Edison International, a generator and distributor of electric power and investor in infrastructure and energy assets, before retiring in July 2008 after 37 years of service. Before January 2005, Mr. McDaniel was chair, chief executive officer, and president of Edison Mission Energy, a power generation business specializing in the development, acquisition, construction, management, and operation of power production facilities.

> Mr. McDaniel was also chief executive officer and a director of Edison Capital, a provider of capital and financial services supporting the growth of energy and infrastructure projects, products, and services, both domestically and internationally. Mr. McDaniel has served on the Board since February 2009. Mr. McDaniel formerly served as chair of the boards of directors of SemGroup, L.P., a midstream energy services company, and Tendril Networks, Inc., a software-as-a-service energy efficiency company. He formerly served on the advisory boards of Cypress Envirosystems, which develops and markets energy efficiency products, and On Ramp Wireless, a communications company serving electrical, gas, and water utilities. Mr. McDaniel also served on the boards of directors of the Senior Care Action Network (SCAN) from 2000 to 2013 and Aquion Energy, a manufacturer of energy storage systems. Through the McDaniel Family Foundation, he is actively involved in a variety of charitable activities, such as the Boys and Girls Club of Huntington Beach, Heifer International, and the Free Wheelchair Mission.
>
> Mr. McDaniel brings significant operational and development experience, including extensive experience growing and operating global electric power businesses, to the Board. In addition, Mr. McDaniel's prior experience as a chief financial officer qualifies him as a financial expert, which is relevant to his duties as an Audit Committee member. It is based on the Board's identification of these qualifications, skills, and experience that the Board has concluded that Mr. McDaniel should serve as a director on the Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

67. By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of SunPower and because of their ability to control the business and corporate affairs of SunPower, the Individual Defendants owed SunPower and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SunPower in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of SunPower and its shareholders so as to benefit all shareholders equally.

68. Each director and officer of the Company owes to SunPower and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

69. The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors and/or officers of SunPower, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

70. To discharge their duties, the controlling shareholders, officers and directors of SunPower were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

71. Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of SunPower, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised SunPower's Board at all relevant times.

72. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

73. To discharge their duties, the officers and directors of SunPower were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of SunPower were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to SunPower's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how SunPower conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of SunPower and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that SunPower's operations would comply with all applicable laws and SunPower's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

74. Each of the Individual Defendants further owed to SunPower and the shareholders the duty of loyalty requiring that each favor SunPower's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

75. At all times relevant hereto, the Individual Defendants were the agents of each other and of SunPower and were at all times acting within the course and scope of such agency.

76. Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with SunPower, each of the Individual Defendants had access to adverse, non-public information about the Company.

77. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by SunPower.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

78. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

79. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law,

including breaches of fiduciary duty, unjust enrichment, gross mismanagement, and waste of corporate assets.

80. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of SunPower was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

81. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

82. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of SunPower and was at all times acting within the course and scope of such agency.

## SUNPOWER'S CODE OF CONDUCT

83. SunPower's Code of Conduct represents that it "powers one of [SunPower's] company values: we do the right thing[]" and is "a statement of SunPower's expectations regarding personal and corporate conduct." The Code of Conduct states the following, in relevant part:

> All people representing SunPower, including employees, contractors, officers and directors of the company, must comply with this Code and avoid even the appearance of improper behavior. The Code also applies to controlled subsidiaries and entities in which SunPower has a majority interest or manages the operations (together, the "Company"). All employees are required to certify to the Company on an annual basis that they have read, understand and agree to comply with the Code. Our Code is not a contract and does not grant any specific employment rights or guarantee.

84. In a section titled "Updates and Waivers," the Code of Conduct states the following:

> We will periodically update this Code. Amendments to this Code (other than technical, administrative or non-substantive changes), must be approved by the Audit Committee of SunPower's Board of Directors. Any waiver of this Code must be approved by the Audit Committee or a Board committee consisting only of independent directors and will be promptly disclosed as required by law.

85. In a section titled "Consequences for Violating the Code," the Code of Conduct states the following:

> Violating any law or this Code is a serious matter. If SunPower determines that an employee has violated the law or this Code, that individual will be subject to disciplinary action, including possible termination of employment, loss of employment-related benefits, and, if applicable, criminal or civil proceedings. Our incentive plans and programs require compliance with the law and this Code as a condition of participation and receiving an award. An employee who violates the law within the scope of his or her employment, or who commits a serious violation of this Code, may not be entitled to incentive compensation, including annual or semi-annual cash bonuses, restricted stock units, or other awards, unless prohibited by law.

86. In another section titled "Maintaining Accurate Records," the Code of Conduct states:

> ***As a publicly traded company, SunPower has an obligation to maintain accurate business and financial records. Each one of us has an obligation to ensure the records we generate are accurate. Never misstate facts, omit critical information or modify records or reports in any way to mislead others, and never assist others in doing so.*** All financial transactions must be correctly and timely recorded in compliance with SunPower's internal controls and procedures. No unrecorded funds or assets may be created or maintained for any purpose. Creating false or misleading records is strictly prohibited and may violate a number of laws, including the Sarbanes-Oxley Act, which may trigger both financial and criminal liability for the employee and/or SunPower.

(Emphasis added.)

***Audit Committee Charter***

87. The SunPower Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

88. Per the "Purpose" section of the Audit Committee Charter, the Audit Committee is tasked with the following responsibilities:

> A. provide oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements and internal controls by the Company's independent public registered accounting firm ("independent auditor");
>
> B. assist the Board in the oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's performance, qualifications and independence; and (iv) the performance of the Company's internal audit function;
>
> C. oversee management's identification, evaluation and mitigation of major risks to the Company;
>
> D. prepare an audit committee report as required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement;
>
> E. provide to the Board such information and materials as it may deem necessary to make the Board aware of the financial matters requiring the attention of the Board; and
>
> F. consider questions of actual and potential conflicts of interest including related party transactions as well as any waiver of the Company's Code of Business Conduct and Ethics.
>
> In addition, the Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board may from time to time prescribe.

89. Under the section titled, "Responsibilities and Duties," the Audit Committee Charter states that the Audit Committee shall do the following, in relevant part:

> 1. review (i) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles or practices as suggested by management or the independent auditor; (ii) major issues as to the adequacy of the Company's internal controls and any special compensating procedures or audit steps adopted in light of material control deficiencies and material weaknesses in the Company's internal control over financial reporting; (iii) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; (iv) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements;

and (v) an annual report furnished by Company management identifying key risks to the Company's worldwide business;

2. discuss with management and the independent auditor the Company's annual audited financial statements and quarterly unaudited financial statements and review the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to filing the Company's annual report on Form 10-K and quarterly reports on Form 10-Q, respectively, with the SEC and, with respect to the annual financial statements, the appropriateness and quality of accounting and auditing principles and practices, including any "critical audit matters" (as that term is defined in PCAOB AS 3101), as well as the adequacy of internal controls that could significantly affect the Company's financial statements;

3. discuss with management and the independent auditor the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information), the type and presentation of information included in the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, provided, however, that the Committee need not discuss in advance each instance in which the Company may provide financial information or earnings guidance, except that if such financial information or an earnings guidance news release is issued, such information or release shall be discussed in advance with the Chair of the Committee or, in the event of his or her unavailability, another Committee member;

4. report regularly to the Board a summary of matters addressed at Committee meetings, any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, the performance of the Company's global audit function and any other matters that the Committee deems appropriate or is requested to report by the Board;

5. review the independent financial statement and internal control audit by: (i) reviewing the independent auditor's proposed audit scope and approach; (ii) discussing with the Company's independent auditor the financial statements, the Company's internal control over financial reporting and the audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies and disagreements with management, any deficiencies, significant deficiencies or material weaknesses and any other matters described in PCAOB Auditing Standard No. 16 or required by the applicable SEC and NASDAQ Rules; and (iii) reviewing reports submitted to the Committee by the independent auditor in accordance with applicable SEC Rules;

6. oversee a post-audit review of the financial statements and audit and control findings with the Head of Audit, senior global audit staff, the Chief Financial Officer and the Principal Accounting Officer, including any suggestions for improvements provided to management by the independent auditor, management's response to such suggestions and the extent to which such improvements have been implemented;

> 7. direct the Company's independent auditor to review before filing with the SEC the Company's interim financial statements included in quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

90. In a section titled "Risk Assessment and Management," the Audit Committee Charter states the following, in relevant part:

> The [Audit] Committee shall: provide assistance to the Board in overseeing, and provide guidance to management on, the identification, evaluation and mitigation of major strategic, operational, regulatory, accounting and financial reporting, informational and external risks inherent in the Company's business worldwide, including: (i) the guidelines and policies governing the process used by the Company's senior management to assess and manage the Company's exposure to risk; and (ii) the major financial risk exposures and the steps management has taken to monitor and control such exposures, and recommend any changes to such policies and procedures to the Board for its approval and adoption;

91. The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof. In further violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

92. Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by issuing materially false and misleading statements to the investing public, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures and failing to adequately oversee the Company's disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### False and Misleading Statements

***2022 10-K***

93. On March 9, 2023, the Company filed the 2022 10-K with the SEC. The 2022 10-K was signed by Defendants Faricy, Dundas, Portes-Laville, McDaniel, Stoquart, Fieldsend, Bram, Anschuetz, and Hegde. Additionally, it contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Faricy and Dundas attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

94. The 2022 10-K reported the following regarding the Company's cost of revenues:

**Total Cost of Revenues and Gross Margin**

| | Fiscal Year Ended | | | | |
|---|---|---|---|---|---|
| (In thousands, except percentages) | January 1, 2023 | % Change | January 2, 2022 | % Change | January 3, 2021 |
| **Cost of Revenues** | | | | | |
| Total cost of revenues | $ 1,377,169 | 53 % | $ 902,718 | 23 % | $ 733,371 |
| **Gross Margin** | | | | | |
| Total gross margin | 21 % | | 20 % | | 16 % |

> ***Our total cost of revenues increased by 53% during fiscal 2022 as compared to fiscal 2021***, as a result of organic revenue growth from our residential businesses across all channels and the Blue Raven acquisition in the fourth quarter of 2021, as well as increasing material, freight, and labor costs due to inflationary pressures. This was partially offset by a decrease in cost of revenues as a result of the wind-down of our Light Commercial business beginning in the first quarter of fiscal 2022.

(Emphasis added.)

95. Moreover, the 2022 10-K reported the following regarding the Company's inventories:

**Inventories**

| | As of | |
|---|---|---|
| **(In thousands)** | **January 1, 2023** | **January 2, 2022** |
| Photo-voltaic modules | $ 156,292 | $ 130,671 |
| Microinverters | 46,088 | 24,040 |
| Energy Storage | 63,327 | 26,849 |
| Other solar power system component materials | 51,108 | 32,872 |
| Inventories[1] | $ 316,815 | $ 214,432 |

[1] Photovoltaic modules are classified as finished goods, while the remaining components of total inventories are classified as raw materials.

96. Further, the 2022 10-K included a report regarding the Company's internal controls over financial reporting, stating:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Management conducted an evaluation of the effectiveness of our internal control over financial reporting using the criteria described in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) ("COSO"). Based on this evaluation, management concluded that our internal control over financial reporting was effective as of January 1, 2023 based on the criteria described in Internal Control-Integrated Framework issued by COSO. Management reviewed the results of its assessment with our Audit Committee.
>
> The effectiveness of the Company's internal control over financial reporting as of January 1, 2023 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included in Item 8 of this Annual Report on Form 10-K.

97. The statements in ¶¶ 93-96 above were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) material weaknesses in internal controls resulted in the Company inaccurately reporting revenue and inventory; (2) because of the foregoing, SunPower was reasonably likely to incur significant charges to restate its previously-reported financial statements; and (3) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

***2023 Proxy Statement***

98. On March 31, 2023, the Company filed its 2023 Proxy Statement with the SEC. Defendants Faricy, Anschuetz, Bram, Fieldsend, Hegde, Louden, McDaniel, Portes-Laville, and Stoquart solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

99. The 2023 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Faricy, Anschuetz, and McDaniel to the Board; (2) an advisory vote on executive compensation; and (3) the ratification of the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for fiscal year 2023.

100. With respect to the Company's Code of Conduct, the 2023 Proxy Statement stated the following, in relevant part:

> Our Code of Business Conduct and Ethics is applicable to our directors, officers, and employees (including our principal executive officer, principal financial officer, and principal accounting officer), as well as to our suppliers, vendors, partners, and other parties that represent us, and is designed to promote compliance with the laws applicable to our business, accounting standards, and proper and ethical business methods and practices. Our Code of Business Conduct and Ethics is available on our website at *http://investors.sunpower.com/corporate-governance/governance-overview* under the tab for "Code of Conduct." You may also request a copy by writing to us at SunPower Corporation, 1414 Harbour Way South, Suite 1901, Richmond, California 94804, Attention: Corporate Secretary. If we amend our Code of Business Conduct and Ethics or grant a waiver applicable to our principal executive officer, principal financial officer, or principal accounting officer, we will post a copy of such amendment or waiver on our website. Under our Corporate Governance Principles, the Audit Committee is responsible for reviewing and recommending changes to our Code of Business Conduct and Ethics.

101. Additionally, the Audit Committee Report included in the Proxy Statement provided the same representations included in the 2022 10-K. It stated:

> The Audit Committee provides the Board such information and materials as it may deem necessary to make the Board aware of financial matters requiring the attention of the Board. The Audit Committee reviews our financial disclosures and meets privately, outside the presence of our management, with our independent registered public accounting firm. In fulfilling its oversight responsibilities, the Audit Committee reviewed and discussed the audited financial statements in our Annual Report on Form 10-K for our fiscal year ended January 1, 2023 with management, including a discussion of the quality and substance of the accounting principles, the reasonableness of significant

> judgments made in connection with the audited financial statements, and the clarity of disclosures in the financial statements. The Audit Committee reports on these meetings to the Board.
>
> Our management has primary responsibility for preparing our financial statements and for our financial reporting process. In addition, our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our independent registered public accounting firm, Ernst & Young LLP, is responsible for expressing an opinion on the conformity of our financial statements to generally accepted accounting principles and the effectiveness of our internal control over financial reporting.

102. Regarding "Leadership Structure and Risk Oversight," the 2023 Proxy Statement stated the following:

> The Board has determined that having a lead independent director assist Mr. Faricy as president, chief executive officer, and chair of the Board is in the best interest of our stockholders. The Board believes this structure ensures a greater role for the independent directors in the oversight of our company and encourages active participation of the independent directors in setting agendas and establishing priorities and procedures for the work of the Board. We believe that this leadership structure also is preferred by a significant number of our stockholders. Mr. McDaniel has served as the lead independent director of our Board since February 2021.
>
> The Board is actively involved in oversight of risks that could affect our company. This oversight is conducted primarily through committees of the Board, in particular our Audit Committee, as disclosed in the descriptions of each of the committees below and in the respective charters of each committee. The full Board, however, has retained responsibility for general oversight of risks. The Board satisfies this responsibility through full reports by each committee chair regarding the committee's considerations and actions, as well as through regular reports directly from our officers responsible for oversight of particular risks within our company.

103. The 2023 Proxy Statement stated the following regarding the performance-based portion of named executive officer compensation:

> ***2022 Compensation Features.*** Our compensation programs are intended to attract, retain, and reward executive officers who contribute to SunPower's success and to align their pay outcomes with the Company's short-term and long-term performance. The Compensation Committee annually reviews the compensation programs for our named executive officers to ensure they achieve the desired goals. In fiscal 2022, the program features incorporated by the Compensation Committee to implement the executive compensation philosophy stated above included a performance-based cash bonus program and long-term incentives in the form of time- and performance-based restricted stock units, in each case tied to achievement of corporate performance targets, and the measurement of individual performance based on each named executive officer's

achievement of his or her personal key results, annual objectives, and adherence to company values, as further described in the "*Compensation Discussion and Analysis*" and "*Executive Compensation*" sections.

104. The 2023 Proxy Statement was materially misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it; and (3) although the Individual Defendants purported to furnish stock grants to executives based upon the performance of the Company, the Company's common stock was artificially-inflated as a result of the false and misleading statements.

105. The 2023 Proxy Statement was also materially misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) material weaknesses in internal controls resulted in the Company inaccurately reporting revenue and inventory; (2) because of the foregoing, SunPower was reasonably likely to incur significant charges to restate its previously-reported financial statements; and (3) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

106. As a result of Defendants Faricy, Anschuetz, Bram, Fieldsend, Hegde, Louden, McDaniel, Portes-Laville, and Stoquart causing the 2023 Proxy Statement to be false and misleading, SunPower shareholders voted, *inter alia*, to: (1) reelect Defendants Faricy, Anschuetz, and McDaniel to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify Ernst & Young LLP as the Company's independent registered accounting firm for fiscal year 2023; and

(3) approve, via non-binding advisory vote, the named executive officers' compensation.

***1Q 2023 Form 10-Q***

107. On May 3, 2023, the Company filed its 1Q 2023 10-Q with the SEC. Defendants Faricy and Dundas signed the SOX certifications attached to the 1Q 2023 10-Q. The SOX certifications were substantively similar or the same as those attached to the 2022 10-K and attested to the accuracy of the 1Q 2023 10-Q.

108. In the 1Q 2023 10-Q, the Company reported the following regarding cost of revenues:

**Total Cost of Revenues and Gross Margin**

| | Three Months Ended | | |
|---|---|---|---|
| **(In thousands, except percentages)** | **April 2, 2023** | **April 3, 2022** | **% Change** |
| **Cost of Revenues** | | | |
| Total cost of revenues | $ 376,767 | $ 277,968 | 36 % |
| | | | |
| **Gross Margin** | | | |
| Total gross margin | 15 % | 21 % | (6)% |

109. Additionally, the 1Q 2023 10-Q reported the following regarding the Company's inventories:

**Inventories**

| | As of | |
|---|---|---|
| **(In thousands)** | **April 2, 2023** | **January 1, 2023** |
| Photo-voltaic modules | $ 206,083 | $ 156,292 |
| Microinverters | 65,388 | 46,088 |
| Energy Storage Systems | 59,996 | 63,327 |
| Other solar power system component materials | 50,380 | 51,108 |
| Inventories[1] | $ 381,847 | $ 316,815 |

[1] Photovoltaic modules are classified as finished goods, while the remaining components of total inventories are classified as raw materials.

110. The statements identified in ¶¶ 107-109 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) material weaknesses in internal controls resulted in the Company inaccurately reporting revenue and inventory; (2) because of the foregoing, SunPower was reasonably likely to incur significant charges to restate its

previously-reported financial statements; and (3) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge**

111. On July 26, 2023, the Company issued a press release announcing its preliminary unaudited financial results for the second quarter of 2023. In it, the Company announced it was revising its guidance for the full year 2023.

112. In the press release, Defendant Faricy represented the following:

> Demand in the second quarter has weakened more than expected in the Southeast and Southwest where macroeconomic uncertainty and higher interest rates have slowed our top-of-funnel lead generation and sales bookings…. To quickly adapt to prevailing market conditions and help ensure SunPower maintains its competitive edge, we are reducing our cost structure. Although we've seen improvements in sales growth in June and July, we've made the decision to reduce our labor costs and are taking additional measures to improve operational efficiency across the board. We believe that these actions will position the company for success as market conditions improve.

113. The press release also stated the following regarding the Company's revisions to its 2023 guidance:

> The company reduced 2023 guidance for GAAP net loss to ($90) million-($70) million.
>
> To accurately reflect its assessment of current and near-future customer demand as well as its mitigating actions to reduce cost structure, the company has reduced its 2023 customer guidance to 70,000–90,000 incremental customers, noting that more than 70% of the projected installations in the second half of 2023 are already accounted for through the execution of existing backlog. This includes the expected recognition of all California NEM 2.0 backlog by year-end and stronger than expected New Homes bookings.
>
> Guidance for Adjusted EBITDA per customer before platform investment was reduced to $1,450-$1,650 to reflect installation costs that are higher than anticipated, as well as the effects of lower market pricing and higher levels of inventory carried this year following the supply chain disruptions of 2022.
>
> The company also expects to reduce Platform Investment to $50 million-$70 million for the year.
>
> Guidance for Adjusted EBITDA for the year was reduced to $55 million-$75 million.

114. On this news, the Company's share price fell from a closing price of $11.22 per share on July 25, 2023 to a closing price of $9.45 per share on July 26, 2023, representing a decrease of $1.77 per share, or 18.5%.

***2Q Form 10-Q***

115. On August 2, 2023, SunPower filed a Form 10-Q with the SEC for the period ended July 2, 2023 (the "2Q 2023 10-Q"). The 2Q 2023 10-Q was signed by Defendant Eby and contained SOX certifications signed by Defendants Faricy and Eby attesting to its accuracy.

116. The 2Q 2023 10-Q reported the following regarding the Company's costs of revenue:

**Total Cost of Revenues and Gross Margin**

| | Three Months Ended | | | Six Months Ended | | |
|---|---|---|---|---|---|---|
| **(In thousands, except percentages)** | **July 2, 2023** | **July 3, 2022** | **% Change** | **July 2, 2023** | **July 3, 2022** | **% Change** |
| **Cost of Revenues** | | | | | | |
| Total cost of revenues | $ 399,724 | $ 336,273 | 19 % | $ 769,667 | $ 614,241 | 25 % |
| | | | | | | |
| **Gross Margin** | | | | | | |
| Total gross margin | 14 % | 20 % | (6)% | 15 % | 20 % | (5)% |

117. The 2Q 2023 10-Q reported the following regarding the Company's inventory:

**Inventories**

| | As of | |
|---|---|---|
| **(In thousands)** | **July 2, 2023** | **January 1, 2023** |
| Photovoltaic modules | $ 244,068 | $ 156,292 |
| Microinverters | 68,832 | 46,088 |
| Energy storage systems | 58,670 | 63,327 |
| Other solar power system component materials | 52,470 | 51,108 |
| Inventories[1] | $ 424,040 | $ 316,815 |

[1] Photovoltaic modules are classified as finished goods, while the remaining components of total inventories are classified as raw materials.

118. The statements identified in ¶¶ 115-117 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) material weaknesses in internal controls resulted in the Company inaccurately reporting revenue and inventory; (2) because of the foregoing, SunPower was reasonably likely to incur significant charges to restate its

previously-reported financial statements; and (3) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Fully Emerges**

119. The truth fully emerged on October 24, 2023, when the Company filed a Form 8-K with the SEC announcing that various of SunPower's previously issued financial statements could no longer be relied upon. In particular, the Form 8-K revealed that the 2022 10-K, the 1Q 2023 10-Q, and the 2Q 2023 10-Q could not be relied upon, nor could "any relevant portions of communication which describe or are based on such financial statements."

120. In full, the Form 8-K stated the following:

> On October 19, 2023, the Audit Committee (the "Audit Committee") of the Board of Directors (the "Board") of SunPower Corporation (the "Company"), based upon the recommendation of management, determined that the Company's (i) audited financial statements included in the Company's Annual Report on Form 10-K for the period ended January 1, 2023, filed with the U.S. Securities and Exchange Commission (the "SEC") on March 10, 2023 (the "Form 10-K"), (ii) unaudited financial statements included in the Company's Quarterly Report on Form 10-Q for the quarterly period ended April 2, 2023, filed with the SEC on May 3, 2023 (the "Q1 2023 Form 10-Q"), and (iii) unaudited financial statements included in the Company's Quarterly Report on Form 10-Q for the quarterly period ended July 2, 2023, filed with the SEC on August 2, 2023 (the "Q2 2023 Form 10-Q," and collectively, the "Affected Periods"), as well as the relevant portions of any communication which describe or are based on such financial statements, should no longer be relied upon. The Company plans to restate, as soon as practicable, the financial statements for the Affected Periods in amendments to the Form 10-K, the Q1 2023 Form 10-Q, and the Q2 2023 Form 10-Q, respectively (collectively, the "Restatement").
>
> In connection with the preparation of the financial statements, the Company preliminarily determined that the value of consignment inventory of microinverter components at certain third-party locations had been overstated in the Affected Periods in the range of approximately $16 million to $20 million, resulting in the associated cost of revenue being understated. At this time, the Company has not fully completed its review, and the expected financial impact of the errors described above is preliminary and subject to change. Additionally, the Company is correcting other immaterial errors in the Affected Periods.
>
> Upon evaluation of the impact to Affected Periods, the Company's management has concluded that in light of the matters described above, a material weakness exists in the Company's internal control over financial reporting. The Company's remediation plan

> with respect to such material weakness will be described in more detail in the Company's amended Form 10-K.
>
> The Company's management also has concluded that the Company's disclosure controls and procedures and internal control over financial reporting were not effective as of January 1, 2023 and the Company's disclosure controls and procedures were not effective as of April 2, 2023 and July 2, 2023. In addition, as a result of the material weakness, Ernst & Young LLP, the Company's independent registered public accounting firm for the year ended January 1, 2023 ("EY"), has determined that its report on internal control over financial reporting as of January 1, 2023, dated March 9, 2023 and included in the Company's Annual Report on Form 10-K for the year ended January 1, 2023 filed with the SEC on March 10, 2023, will be revised to an adverse opinion that internal control over financial reporting was ineffective and reissued.

121. On this news, the Company's stock price declined from a closing price of $4.96 per share on October 24, 2023 to a closing price of $4.06 per share on October 25, 2023, representing a decline of $0.90 per share, or 18.1%.

**Repurchases During the Relevant Period**

122. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $6.36 million to repurchase 478,345 shares of its own common stock at artificially-inflated prices from March 2023 through August 2023.

123. According to the 1Q 2023 10-Q, between February 27, 2023[2] and April 2, 2023, the Company purchased 290,752 shares of its common stock for approximately $4,451,413.12 at an average price of $15.31 per share.

124. As the Company's stock was actually worth only $4.06 per share, the price at closing on October 25, 2023, the Company overpaid by approximately $3,270,960 for repurchases of its own stock between February 27, 2023 and April 2, 2023.

125. According to the 2Q 2023 10-Q, between April 3, 2023 and April 30, 2023, the Company purchased 26,712 shares of its common stock for approximately $351,529.92 at an average price of $13.16 per share.

[2] All shares are reasonably assumed to have been purchased within the Relevant Period.

126. As the Company's stock was actually worth only $4.06 per share, the price at closing on October 25, 2023, the Company overpaid by approximately $243,079.20 for repurchases of its own stock between April 3, 2023 and April 30, 2023.

127. According to the 2Q 2023 10-Q, between May 1, 2023 and May 28, 2023, the Company purchased 18,641 shares of its common stock for approximately $210,456.89 at an average price of $11.29 per share.

128. As the Company's stock was actually worth only $4.06 per share, the price at closing on October 25, 2023, the Company overpaid by approximately $134,774.43 for repurchases of its own stock between May 1, 2023 and May 28, 2023.

129. According to the 2Q 2023 10-Q, between May 29, 2023 and July 2, 2023, the Company purchased 81,479 shares of its common stock for approximately $873,454.88 at an average price of $10.72 per share.

130. As the Company's stock was actually worth only $4.06 per share, the price at closing on October 25, 2023, the Company overpaid by approximately $542,650.14 for repurchases of its own stock between May 29, 2023 and July 2, 2023.

131. According to the Form 10-Q the Company filed with the SEC on December 18, 2023 (the "3Q 2023 10-Q"), between July 3, 2023 and July 30, 2023 the Company purchased 8,821 shares of its common stock for approximately $85,387.28 at an average price of $9.68 per share.

132. As the Company's stock was actually worth only $4.06 per share, the price at closing on October 25, 2023, the Company overpaid by approximately $49,574 for repurchases of its own stock between July 3, 2023 and July 30, 2023.

133. According to the 3Q 2023 10-Q, between July 31, 2023 and August 27, 2023, the Company purchased 10,595 shares of its common stock for approximately $91,858.65 at an average price of $8.67 per share.

134. As the Company's stock was actually worth only $4.06 per share, the price at closing on October 25, 2023, the Company overpaid by approximately $48,842.95 for repurchases of its own stock between July 31, 2023 and August 27, 2023.

135. According to the 3Q 2023 10-Q, between August 28, 2023 and October 1, 2023, the Company purchased 41,345 shares of its common stock for approximately $296,030.20 at an average price of $7.16 per share.

136. As the Company's stock was actually worth only $4.06 per share, the price at closing on October 25, 2023, the Company overpaid by approximately $128,169.50 for repurchases of its own stock between August 28, 2023 and October 1, 2023.

137. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $6.40 more than the actual worth of each share during the Relevant Period. Thus, the total over payment by the Company for repurchases of its own stock during the Relevant Period was approximately $4.41 million.

## DAMAGES TO SUNPOWER

138. As a direct and proximate result of the Individual Defendants' conduct, SunPower has lost and expended, and will continue to lose and expend, many millions of dollars.

139. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

140. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

141. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

142. Such losses include the Company's overpayment by over $4.41 million for repurchases of its own stock during the period when the Company's stock price was artificially-inflated due to the false and misleading statements discussed herein.

143. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

144. As a direct and proximate result of the Individual Defendants' conduct, SunPower has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

145. Plaintiff brings this action derivatively and for the benefit of SunPower to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of SunPower, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act, as well as the aiding and abetting thereof.

146. SunPower is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

147. Plaintiff is, and has continuously been at all relevant times, a shareholder of SunPower. Plaintiff will adequately and fairly represent the interests of SunPower in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

148. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

149. A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consisted of Defendants Faricy, Anschuetz, Bram, Fieldsend, Hegde, Zibelman, Louden, Portes-Laville, and Stoquart (the "Director-Defendants"). Plaintiff needs only to allege demand

futility as to five of the nine Director-Defendants that were on the Board at the time this action was commenced.

150. Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts while causing SunPower to spend over $6.36 million to repurchase its own stock at artificially-inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

151. Moreover, Defendants Faricy, Anschuetz, Bram, Fieldsend, Hegde, Louden, Portes-Laville, and Stoquart solicited the 2023 Proxy Statement to call for a shareholder vote to, *inter alia*, reelect Defendants Faricy, Anschuetz, and McDaniel to the Board, thus allowing them to continue breaching their fiduciary duties to SunPower. Thus, demand is futile and excused as to them.

152. Additional reasons that demand on Defendant Faricy is futile follow. Defendant Faricy has served as the CEO, President, and Chairperson of the Board since 2021. Thus, as the Company admits, he is a non-independent director. The Company also provides Defendant Faricy with his principal occupation for which he is handsomely paid. As CEO, Defendant Faricy is ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the following statements: 2022 10-K, 2023 Proxy Statement, 1Q 2023 10-Q, and 2Q 2023 10-Q. Additionally, Defendant Faricy personally signed the 2022 10-K and the SOX Certifications attached to the 2022 10-K, 1Q 2023 10-Q, and 2Q 2023 10-Q, and thus personally made the false and misleading statements contained therein. As the Company's top executive officer and trusted Chairperson of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Faricy is a defendant in the Securities Class Actions. For these

reasons, too, Defendant Faricy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153. Additional reasons that demand on Defendant Anschuetz is futile follow. Defendant Anschuetz has served as a Company director since 2021. As a member of the Board, he serves on the Nominating Committee. As the Company admits, Defendant Anschuetz is not an independent director. Defendant Anschuetz signed the 2022 10-K and solicited the 2023 Proxy Statement, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Anschuetz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154. Additional reasons that demand on Defendant Bram is futile follow. Defendant Bram has served as a Company director since 2022. As a member of the Board, he serves on the Compensation Committee. As the Company admits, Defendant Bram is not independent. Defendant Bram signed the 2022 10-K and solicited the 2023 Proxy Statement, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Bram breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon him is futile and, therefore, excused.

155. Additional reasons that demand on Defendant Fieldsend is futile follow. Defendant Fieldsend has served as a member of the Board since 2022. As a member of the Board, he serves on the Nominating Committee. As the Company admits, Defendant Fieldsend is not independent. Defendant Fieldsend signed the 2022 10-K and solicited the 2023 Proxy Statement, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and consciously

disregarded his duties to protect corporate assets. For these reasons, Defendant Fieldsend breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon him is futile and, therefore, excused.

156. Additional reasons that demand on Defendant Hegde is futile follow. Defendant Hegde has served as a member of the Board since 2021. As a member of the Board, he serves as the Chairperson of the Compensation Committee and as a member of the Audit Committee. For his service on the Board, Defendant Hegde is entitled to substantial compensation and stock awards. Defendant Hegde signed the 2022 10-K and solicited the 2023 Proxy Statement, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hegde breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

157. Additional reasons that demand on Defendant Zibelman is futile follow. Defendant Zibelman has served as a Company director since May 17, 2023. As a member of the Board, she serves as the Chairperson of the Nominating Committee and as a member of the Audit Committee. For her service on the Board, she will be entitled to substantial compensation and lucrative stock awards. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded her duties to protect corporate assets. Additionally, as a member of the Audit Committee she was obligated to ensure that the Company's internal controls were functional and that its financial statements were fair and accurate. Under her watch, the Company had to restate, *inter alia*, the 2Q 2023 10-Q. For these reasons, Defendant Zibelman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

158. Additional reasons that demand on Defendant Louden is futile follow. Defendant Louden has served as a Company director since March 14, 2023. As a member of the Board, he serves as the Lead Independent Director, the Chairperson of the Audit Committee, and as a member of the

Compensation and Nominating Committees. Additionally, as the Chairperson of the Audit Committee, Defendant Louden is ultimately responsible for all of the false and misleading financial statements that the Company published. Under Defendant Louden's watch, the Company had to restate its 1Q 2023 10-Q and 2Q 2023 10-Q. Additionally, Defendant Louden was obligated to ensure that the Company's internal controls on financial reporting were effective and he failed to do so. As the trusted Lead Independent Director and Chairperson of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Louden breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon him is futile and, therefore, excused.

159. Additional reasons that demand on Defendant Portes-Laville is futile follow. Defendant Portes-Laville has served as a Company director since 2021. As the Company admits, Defendant Portes-Laville is not an independent director. Defendant Portes-Laville signed the 2022 10-K and solicited the 2023 Proxy Statement, both of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Portes-Laville breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

160. Additional reasons that demand on Defendant Stoquart is futile follow. Defendant Stoquart has served as a Company director since 2022. As a member of the Board, he serves on the Compensation Committee. As the Company admits, Defendant Stoquart is not an independent director. Moreover, Defendant Stoquart signed the 2022 10-K and solicited the 2023 Proxy Statement, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Stoquart breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

161. Additional reasons that demand on the Board is futile follow.

162. Defendants Hegde, Zibelman, and Louden served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, Defendants Hegde, Zibelman, and Louden were responsible for overseeing, *inter alia*, the Company's accounting and financial reporting processes, the integrity of the Company's financial statements and reports, and the adequacy of the Company's internal controls over financial reporting. During the Relevant Period, Defendants Hegde, Zibelman, and Louden failed to ensure the integrity of the Company's financial statements and internal controls, as they were charged to do under the Audit Committee Charter, thereby allowing the Company to engage in improper accounting methods and to file false and misleading financial statements with the SEC. Thus, Defendants Hegde, Zibelman, and Louden breached their fiduciary duties, are not disinterested, and demand is excused as to them.

163. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

164. SunPower has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for SunPower any part of the damages SunPower suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

165. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional,

reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

166. The acts complained of herein constitute violations of fiduciary duties owed by SunPower's officers and directors, and these acts are incapable of ratification.

167. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of SunPower. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of SunPower, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

168. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause SunPower to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

169. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

170. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

171. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

172. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

173. Under the direction and watch of Defendants Faricy, Anschuetz, Bram, Fieldsend, Hegde, Louden, Portes-Laville, Stoquart, and McDaniel, the 2023 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it; and (3) although the Individual Defendants purported to furnish stock grants to executives based upon the performance of the Company, the Company's common stock was artificially-inflated as a result of the false and misleading statements. As a result, the Company's public statements were materially false and misleading at all relevant times.

174. Moreover, the 2023 Proxy Statement failed to disclose, *inter alia*, that: (1) material weaknesses in internal controls resulted in the Company inaccurately reporting revenue and inventory;

(2) because of the foregoing, SunPower was reasonably likely to incur significant charges to restate its previously-reported financial statements; and (3) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

175. Defendants Faricy, Anschuetz, Bram, Fieldsend, Hegde, Louden, Portes-Laville, Stoquart, and McDaniel knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the election of directors.

176. The false and misleading elements of the 2023 Proxy Statement led shareholders, *inter alia*, to: (1) reelect Defendants Faricy, Anschuetz, and McDaniel to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify Ernst & Young LLP as the Company's independent registered accounting firm for fiscal year 2023; and (3) approve, via non-binding advisory vote, the named executive officers' compensation.

177. The Company was damaged as a result of Defendants Faricy, Anschuetz, Bram, Fieldsend, Hegde, Louden, Portes-Laville, Stoquart, and McDaniel's material misrepresentations and omissions in the 2023 Proxy Statement.

178. Plaintiff on behalf of SunPower has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

179. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding SunPower. Not only is SunPower now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon SunPower by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual

Defendants' misconduct, the Individual Defendants caused the Company to repurchase hundreds of thousands of its own shares on the open market at artificially-inflated prices, damaging SunPower.

181. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

182. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about SunPower not misleading.

183. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by SunPower.

184. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

185. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

186. Plaintiff on behalf of SunPower has no adequate remedy at law.

**THIRD CLAIM**

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

187. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188. The Individual Defendants, by virtue of their positions with SunPower and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of SunPower and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause SunPower to engage in the illegal conduct and practices complained of herein.

189. Plaintiff on behalf of SunPower has no adequate remedy at law.

**<u>FOURTH CLAIM</u>**
**Against Individual Defendants for Breach of Fiduciary Duties**

190. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of SunPower's business and affairs.

192. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

193. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of SunPower.

194. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

195. In further breach of their fiduciary duties owed to SunPower, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) material weaknesses in internal controls resulted in the Company inaccurately reporting revenue and inventory; (2) because of the foregoing, SunPower was reasonably likely to incur significant charges to restate its previously-reported

financial statements; and (3) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

196. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

197. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

198. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

199. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

200. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, SunPower has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

201. Plaintiff on behalf of SunPower has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants for Unjust Enrichment**

202. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

203. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, SunPower.

204. The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from SunPower that was tied to the performance or artificially-inflated valuation of SunPower or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

205. Plaintiff, as a shareholder and a representative of SunPower, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

206. Plaintiff on behalf of SunPower has no adequate remedy at law.

**SIXTH CLAIM**
**Against Individual Defendants for Waste of Corporate Assets**

207. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

208. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class

Actions), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

209. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

210. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

211. Plaintiff on behalf of SunPower has no adequate remedy at law.

## **SEVENTH CLAIM**
### **Against Individual Defendants for Abuse of Control**

212. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

213. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence SunPower, for which they are legally responsible.

214. As a direct and proximate result of the Individual Defendants' abuse of control, SunPower has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

215. Plaintiff on behalf of SunPower has no adequate remedy at law.

## **EIGHTH CLAIM**
### **Against Individual Defendants for Gross Mismanagement**

216. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

217. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of SunPower in a manner consistent with the operations of a publicly-held corporation.

218. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, SunPower has sustained and will continue to sustain significant damages.

219. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

220. Plaintiff on behalf of SunPower has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Faricy, Dundas, and Eby for Contribution Under Sections 10(b) and 21D of the Exchange Act

221. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

222. SunPower and Defendants Faricy, Dundas, and Eby are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Faricy's, Dundas's, and Eby's willful and/or reckless violations of their obligations as officers and/or directors of SunPower.

223. Defendants Faricy, Dundas, and Eby, because of their positions of control and authority as officers and/or directors of SunPower, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of SunPower, including the wrongful acts complained of herein and in the Securities Class Actions.

224. Accordingly, Defendants Faricy, Dundas, and Eby are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

225. As such, SunPower is entitled to receive all appropriate contribution or indemnification from Defendants Faricy, Dundas, and Eby.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of SunPower, and that

Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to SunPower;

(c) Determining and awarding to SunPower the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing SunPower and the Individual Defendants to take all necessary actions to reform and improve SunPower's corporate governance and internal procedures to comply with applicable laws and to protect SunPower and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of SunPower to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding SunPower restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 12, 2024

Respectfully submitted,

*/s/ Robert C. Moest*____________
**THE BROWN LAW FIRM, P.C.**
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
eitank@bgandg.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Jianping Ma, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11 day of January, 2024.

DocuSigned by:
B3D410B099D34FE...
Jianping Ma